# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

    Plaintiff,

vs.                                                                                             No. CR-01-495 MV

HERMAN FISHER,

    Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on Defendant Herman Fisher's Motion to Suppress June 15, 2000 Statement **[Doc. No. 12]**. The Court, having considered the motion, briefs, relevant law and being otherwise fully informed, finds that the motion is well taken and will be **GRANTED**.

## BACKGROUND

On June 15, 2000, at approximately 9:30 a.m., Special Agent Scott Campbell of the Federal Bureau of Investigation and Special Agent Laura Naranjo of the Department of Interior, Office of Inspector General, visited Defendant in his office at the Bureau of Indian Affairs to request an interview regarding Defendant's work. At that time, Defendant was employed by the BIA as an occupational safety and health specialist, specifically as a project manager of five portable classroom projects. Defendant and Agents Campbell and Naranjo together went by car to the FBI office, where the interview took place. Agents Campbell and Naranjo began the interview by discussing background information about Defendant's work and personal history and the portable classroom contracts in general. After approximately one and one-half hours into the interview, the agents focused on the events concerning the charged offenses of bribery and showed Defendant videotapes of secretly taped meetings between himself and Larry Morrison, who was also involved in the

portable classroom projects. Defendant then responded to the agents' questions regarding the alleged bribes, and he ultimately signed a written statement drafted by Agent Naranjo that summarized the main points of the interview. When the interview ended, the agents took Defendant to his office to pick up some personal items and to sign out, and then drove Defendant to his residence. Just prior to their arrival at Defendant's home, Agents Campbell and Naranjo informed Defendant that several FBI agents were currently searching his residence pursuant to a search warrant. Defendant at no time was placed under formal arrest and never received his *Miranda* rights.

On April 24, 2001, Defendant was indicted on four counts of demanding and receiving a bribe by a public official in violation of 18 U.S.C. § 201(b)(2)(A)–(C) **[Doc. No. 1]**. On September 10, 2001, Defendant filed a motion to suppress the statements made on June 15, 2000 **[Doc. No. 12]**, arguing that he did not receive his *Miranda* rights although he was "in custody" at the time of the interrogation and that his confession was involuntary. The government responded on September 27, 2001 **[Doc. No. 21]**, and Defendant filed his reply on October 26, 2001 **[Doc. No. 26]**. The Court held an evidentiary hearing on the motion to suppress on May 8–9, 2002, after which the Court took the motion under advisement.

## STANDARDS

### I. Violation of Miranda Rights

Any person subject to custodial interrogation is constitutionally entitled to receive *Miranda* rights, and a failure to receive these rights makes any subsequent statements *per se* inadmissible. *See Dickerson v. United States*, 530 U.S. 428 (2000); *Miranda v. Arizona*, 384 U.S. 436 (1966). "Custodial interrogation" is defined as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant

way." *Oregon v. Mathiason*, 429 U.S. 492, 494 (1977). An interrogation is "express questioning or its functional equivalent," which includes "words or actions on the part of the police that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 300–301 (1980). Incriminating response is defined as "any response—whether inculpatory or exculpatory—that the *prosecution* may seek to introduce at trial." *Innis*, 446 U.S. at 301 n.5. It is not disputed by either party that an interrogation, *i.e.*, express questioning that was reasonably likely to elicit an incriminating response, took place on June 15, 2000. Thus, the focus of the Court's inquiry is whether or not Defendant was "in custody" during the interrogation.

Two separate inquiries are necessary to determine whether Defendant was "in custody" when making his statements:

> [F]irst, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave. Once the scene is set and the players' lines and actions are reconstructed, the court must apply an objective test to resolve the "ultimate inquiry": [was] there a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.

*Thompson v. Keohane*, 516 U.S. 99, 112 (1995) (quotations and footnote omitted). These inquiries require a fact-intensive analysis in which the Court examines the "totality of the circumstances." *See United States v. Rith*, 164 F.3d 1323, 1332 (10th Cir. 1999).

The "in custody" analysis is based on an *objective* standard: "how a reasonable man in the suspect's position would have understood his situation." *Stansbury v. California*, 511 U.S. 318, 324

(quoting *Berkemer v. McCarty*, 468 U.S. 420, 442 (1984)). "[A]n officer's subjective and undisclosed view concerning whether the person being interrogated is a suspect is irrelevant to the assessment whether the person is in custody." *Id.* at 319. However,

> An officer's knowledge or beliefs may bear upon the custody issue if they are conveyed, by word or deed, to the individual being questioned. Those beliefs are relevant only to the extent they would affect how a reasonable person in the position of the individual being questioned would gauge the breadth of his or her freedom in action. Even a clear statement from an officer that the person under interrogation is a prime suspect is not, in itself, dispositive of the custody issue, for some suspects are free to come and go until the police decide to make an arrest. The weight and pertinence of any communications regarding the officer's degree of suspicion will depend upon the facts and circumstances of the particular case.

*Id.* at 325 (quotations and internal citations omitted).

Moreover, "a suspect can be placed in police 'custody' for purposes of *Miranda* before he has been 'arrested' in the Fourth Amendment sense." *United States v. Perdue*, 8 F.3d 1455, 1463–64 (10th Cir. 1993) (citing *Berkemer*, 468 U.S. at 441). Yet, "a suspect is not in custody for purposes of *Miranda* simply because he is the 'focus' of an investigation. Nor does the fact that an interview is conducted by law enforcement officers or the fact that the questioned person is one whom the police suspect transform an interview into custodial interrogation." *United States v. Chalan*, 812 F.2d 1302, 1306 (10th Cir. 1987) (quotations and internal citations omitted).

## II.     Involuntary Confession

The voluntariness of a confession is a question of fact to be determined by the "totality of circumstances," which included considerations of "the youth of the accused, his lack of education, his low intelligence, the lack of any advice to the accused of his constitutional rights, the length of detention, the repeated and prolonged nature of the questioning, and the use of physical punishment such as the deprivation of food or sleep." *Schneckloth v. Bustamonte*, 412 U.S. 219, 226 (1973)

(internal citations omitted); *see also United States v. Glover*, 104 F.3d 1570, 1579 (10th Cir. 1997). "[K]nowledge of a right to refuse is not a prerequisite of a voluntary consent." *Schneckloth*, 412 U.S. at 234. Moreover, "when a confession challenged as involuntary is sought to be used against a criminal defendant at his trial, he is entitled to a reliable and clear-cut determination that the confession was in fact voluntarily rendered. Thus, the prosecution must prove at least by a preponderance of the evidence that the confession was voluntary." *Lego v. Twomey*, 404 U.S. 477, 489 (1972); *accord United States v. McCullah*, 76 F.3d 1087, 1100 (10th Cir. 1996).

The Tenth Circuit has further held that "[w]hether a defendant's incriminating statements were made voluntarily must be assessed from the totality of the circumstances, looking both at the characteristics of the defendant and the details of the interrogation. The essence of voluntariness is whether the government obtained the statements by physical or psychological coercion such that the defendant's will was overborne." *Rith*, 164 F.3d at 1333 (internal citations omitted). Indeed, "coercive police activity is a *necessary predicate* to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment." *Colorado v. Connelly*, 479 U.S. 157, 167 (1986) (emphasis added); *accord United States v. Erving L.*, 147 F.3d 1240, 1249 (10th Cir. 1998). Thus, "personal characteristics of the defendant are constitutionally irrelevant absent proof of coercion." *Id.* (quoting *United States v. Rohrbach*, 813 F.2d 142, 144 (8th Cir. 1987)); *see also United States v. Guerro*, 983 F.2d 1001, 1004 (10th Cir. 1993) (holding that "factors must be considered in relation to the tactics employed by the police to determine if police took unfair advantage of a defendant's traits or the surrounding circumstances"). "[C]oercion need not depend upon actual violence by a government agent; a credible threat is sufficient." *United States v. McCullah,* 76 F.3d 1087, 1101 (10th Cir. 1996). Coercion may also include situations

where "the police . . . somehow overreach by exploiting a weakness or condition known to exist." *United States v. Robertson*, 19 F.3d 1318, 1321 (10th Cir. 1994).

## DISCUSSION

**I.     Violation of Miranda Rights**

As already indicated, there is no dispute that Defendant was subject to an "interrogation" because Agents Campbell and Naranjo engaged in "express questioning or its functional equivalent" that they should have known were "reasonably likely to elicit an incriminating response." *Innis*, 446 U.S. at 300–301. Therefore, the Court must only determine whether or not Defendant was "in custody" during the interrogation to evaluate Defendant's *Miranda* rights. The "in custody" analysis consists of two inquiries: (1) "the circumstances surrounding the interrogation;" and (2) "given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave." *Thompson*, 516 U.S. at 112.

The testimonies presented at the evidentiary hearing were sharply in dispute, so the Court must make its own factual findings and credibility determinations in order to evaluate "the circumstances surrounding the interrogation." The disputed facts are as follows: (1) whether or not Defendant offered to have the interview in a BIA conference room; (2) whether Agents Campbell and Naranjo informed Defendant that he was not under arrest and was free to leave; (3) the length of the interview; (4) whether the agents offered Defendant any drinks or bathroom breaks or permitted him to use the phone during the interrogation; (5) whether Defendant appeared too distracted to drive at the end of the interrogation; and (6) whether Defendant wanted to drive his own car, rather than ride with the agents to his residence.

Upon careful review of all of the testimonies and evidence presented at the evidentiary hearing and the parties' briefs, the Court finds Defendant's testimony to be more credible. It would seem much more convenient for Defendant to meet with the agents at his own office rather than going to the FBI offices for what at that time appeared merely to be general questions about his work, so it is perfectly reasonable for Defendant to have offered the use of one the conference rooms in his office. Moreover, because the agents obviously preferred to conduct the interview in their offices, it is also reasonable that they made such a suggestion to Defendant, who promptly agreed. Defendant at no time asserted that he was forced to go to the FBI office, but rather that he initially offered to have the interview at his own office.

Agents Campbell and Naranjo contend that they advised Defendant of not being under arrest both at his office and at the commencement of the interrogation at the FBI office. (R. at 10, 15, 80.) Defendant, on the other hand, argues that had he been so informed, he would never have voluntarily agreed to the interview. (R. at 169–70.) All parties agree that Defendant did not know the main focus of the interrogation until one and one-half hours into the interview. (R. at 126, 171.) The Court agrees with Defendant that had the agents mentioned the fact that he was not under arrest, he would have not been so surprised about the main focus of the interrogation; thus, he probably was not so informed.

According to Agents Campbell and Naranjo, the interview lasted just under three hours, but through the lunch hour. (R. at 48, 126–27.) However, Defendant claims the interview ended at approximately 2:00 p.m. (R. at 169), and Mrs. Fisher, Defendant's wife, testified that Defendant arrived at their residence with the agents shortly around 3:00 p.m. (R. at 207). The Court believes that Defendant is more accurate with regards to the length of the interview given his more specific

estimate of the timing of the interview's commencement and closure, and also in light of Mrs. Fisher's testimony. Therefore, the Court finds that the interrogation lasted approximately four hours.

Agents Campbell and Naranjo further assert that Defendant never requested a break or the use of the phone (R. at 20, 49, 85–86), whereas Defendant claims that he was specifically denied requests for lunch and the opportunity to call his wife (R. at 172–73). The Court notes that the interview lasted around four hours—from approximately 10:00 a.m. to 2:00 p.m. During this entire time, Defendant did not once use the bathroom, make a phone call, or eat lunch. The Court finds Defendant's version of events to be more credible in light of Defendant's medical problems and his custom of calling his wife during the lunch hour. It is undisputed that Defendant currently suffers from a myriad of health problems, including prostate cancer, blood clots, a hernia, and Peyronie's disease. Under such circumstances, it is very likely that Defendant would become easily tired from such an extensive interrogation and would request some form of break.

Additionally, it is undisputed that Defendant habitually called his wife around lunch time due to her concerns about his health. (R. at 157.) Thus, he would very likely have requested to make that phone call during the interview, which went past the lunch hour. Had Defendant called his wife, he would have discovered that FBI agents were searching his home at that very moment, which Agent Campbell admitted would have interfered with the interrogation. (R. at 145.) According to Defendant, he made his requests towards the end of the interview, and the agents may have correctly stated that the interview was almost over and that breaks were not necessary. However, that does not change the fact that Defendant was not able to freely leave the interview room or call his wife during the interrogation.

The agents' testimonies have also created some confusion regarding Defendant's mental state upon the conclusion of the interview. Agent Campbell testified that Defendant appeared distracted and that, with his years of experience at the California Highway Patrol, he did not feel comfortable allowing Defendant to drive himself home. (R. at 97.) Agent Naranjo, on the other hand, stated that Defendant appeared distracted only when the interrogation focused on the alleged bribes discussed on the videotapes, and that he did not appear distracted when the interview ended. (R. at 56–58.) The Court finds that Defendant appeared distracted at the close of the interview, which perhaps prompted the agents to offer to drive him home.

This finding affects another disputed issue—whether or not Defendant ever conveyed a desire to drive his own car back to his residence. The Court believes Defendant's contention that he initially wanted to drive his own car, but was persuaded by the agents to ride with them due to his distracted state. Defendant has never claimed that they forced him to ride with them, but rather claims that he would have preferred to drive himself and made this known to the agents. The Court finds Defendant's account to be entirely reasonable, and that he only accompanied the agents to his residence upon their insistence.

The Court is now left with the following circumstances to evaluate the nature of the interrogation: (1) the agents suggested that the interview take place at an FBI office rather than Defendant's own office; (2) the agents did not advise Defendant that he was not under arrest; (3) the interview lasted approximately four hours with no breaks whatsoever; (4) Defendant was not permitted to take a break or call his wife during the interview because the agents claimed it was almost over; (5) Defendant appeared to be in a distracted state at the end of the interview, which prompted the agents to drive him home; (6) Defendant stopped by his office on his way home, and

was accompanied by Agent Campbell during the entire time, even to the bathroom; (7) Defendant did not know the purpose of the interview until after approximately one and one-half hours of general questions about his work, personal life, and the portable classroom contracts in general; (8) the videotapes referred to in the interview were already in the interview room prior to the agents initial contact with Defendant; (9) Defendant suffered from a variety of physical ailments, including prostate cancer, blood clots, a hernia, and Peyronie's disease; (10) the agents had knowledge of Defendant's physical condition; and (11) FBI agents were executing a search warrant at Defendant's residence simultaneous to the interrogation, and Agent Campbell was immediately informing these agents of information ascertained during the interrogation to assist the search.

The Court finds that in light of the circumstances surrounding the interrogation, no reasonable person would have felt at liberty to terminate the interrogation and leave; and, thus, Defendant was "in custody" at the time of his interrogation. Because Defendant was subject to "custodial interrogation," he was entitled to receive *Miranda* warnings. The agents' failure to comply with *Miranda* violated Defendant's constitutional rights and renders inadmissible any statements made by Defendant during the interrogation.

The Court first notes that although Defendant voluntarily accompanied the agents to the FBI offices and participated in the interview, he did not know the purpose of the interview at that time. Only when Agent Naranjo mentioned the videotapes did Defendant finally discover the true intentions of the agents' questioning. Thus, Defendant may have voluntarily participated in an interview about his work generally, but he might very likely have felt differently if the agents informed him about the true purpose of the interview.

Moreover, it is clear from the testimonies that the agents had a specific plan on how to conduct the interrogation and execute the search warrant simultaneously. The agents obviously intended to conduct the interview in the FBI office where the videotapes were ready to be shown to Defendant. The agents further intended to use the information ascertained from the interrogation of Defendant to assist in the search of Defendant's home. Thus, the search and interrogation had to take place simultaneously. If Defendant knew about the search during the interrogation, he may not have voluntarily provided information. On the other hand, if Defendant was interrogated prior to the search, he might have attempted to hide or destroy potentially incriminating evidence.

The Court acknowledges that the agents' simultaneous interrogation and search were valid investigatory techniques to gather evidence in this case. Furthermore, whether or not Defendant was a focus of the investigation during the interrogation is irrelevant. The agents' plan or intent in conducting their investigation is likewise irrelevant for purposes of ruling on this motion to suppress, except to the extent that it affected Defendant's "in custody" status.

While it may be true that Defendant voluntarily participated in the interview with Agents Campbell and Naranjo, circumstances changed once they revealed the true purpose of the interview. Yet, this is not enough to establish "custody" because "[e]ven a clear statement from an officer that the person under interrogation is a prime suspect is not, in itself, dispositive of the custody issue." *Stansbury*, 511 U.S. at 325. However, a reasonable person in Defendant's circumstances would not have felt at liberty to terminate the interrogation and leave when the agents did not permit him to call his wife or take a break for lunch. Even if the agents were "almost finished," the fact that Defendant needed to ask permission to take a break and call his wife, and was subsequently denied his requests,

indicate that the agents were in charge of the situation and that Defendant was not free to leave at that point.

Clearly, the agents wanted to wrap up the interview and have Defendant sign a written statement before he learned of the search taking place at his residence, but Defendant would have immediately learned of the search if he called his wife. Thus, by preventing Defendant from contacting his wife, the agents effectively placed Defendant "in custody" and was constitutionally obligated to provide *Miranda* warnings to Defendant.

The agents' behavior after the interview also supports the Court's conclusions. Defendant was persuaded to remain with the agents, rather than to leave freely on his own accord, because the agents were driving to Defendant's home themselves and they felt uncomfortable with his mental state. Yet, even if the agents were simply giving Defendant a ride home, there was absolutely no reason for Agent Campbell to accompany Defendant back to his office and even to the restroom. At no time since his initial interaction with the agents was Defendant ever outside of their presence, and Defendant was never given the privacy to contact his wife during the course of events on that day.

## II.     **Involuntary Confession**

Because the Court has granted Defendant's motion on the grounds that he was "in custody" during the interrogation by Agents Campbell and Naranjo and, thus, entitled to *Miranda* warnings, it does not find it necessary to address whether or not Defendant's statement was involuntarily made.

## CONCLUSION

The Court acknowledges the need of law enforcement officers to take advantage of every available opportunity to maximize their investigation, but such efforts cannot compromise the

constitutional rights of the targets of their investigation. If agents wish to safeguard the evidence ascertained during interrogations of suspects, they should either provide *Miranda* rights to the suspect or tape the interrogation so there is no dispute as to whether or not the suspect was in custody. Yet, in this case, the agents failed to take such precautions, and their attempt to circumvent the requirements of *Miranda* has left the Court no choice but to make a credibility determination in favor of Defendant and to suppress the statements made by Defendant during the interrogation.

**IT IS THEREFORE ORDERED** that Defendant Herman Fisher's Motion to Suppress June 15, 2000 Statement **[Doc. No. 12]** is hereby **GRANTED**.

Dated this 9th day of August, 2002.

_____
MARTHA VÁZQUEZ
U. S. DISTRICT COURT JUDGE

Attorney(s) for Plaintiff(s):
Sasha Siemel, Esq.

Attorney(s) for Defendant(s):
Billy R. Blackburn, Esq.